U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YUMILICIOUS FRANCHISE, L.L.C. § | | |
|     Plaintiff § | | |
| § | | |
| Vs. § | | Cause No. 3:13-cv-04841 |
| § | | |
| MATT BARRIE, KELLY GLYNN, § | | |
| BRIAN GLYNN, and WHY NOT, L.L.C. § | | |
|     Defendants § | | |

## DEFENDANTS' ORIGINAL ANSWER, COUNTER-CLAIM, AND JURY DEMAND

Come now **Defendants and Counter-Plaintiffs**, Matt Barrie, Kelly Glynn, Brian Glynn and Why Not, LLC, submitting this their **Original Answer, Counter-Claim and Jury Demand** and would show onto the Court as follows:

**Answer**

1.   Defendants deny the material allegations of Paragraph 1 of the Complaint and demand strict proof thereof.

2.   Defendants deny the material allegations of Paragraph 2 of the Complaint and demand strict proof thereof.

3.   Defendants admit the material allegations of Paragraphs 3 through 11 of the Complaint.

4.   Defendants deny the material allegations of Paragraphs 11 through 26 of the Complaint and demand strict proof thereof. Defendants state that the allegations set forth in Paragraph 13 of the Complaint purport to characterize documents that speak for themselves and in further response to Paragraph 23 of the Complaint, Defendants adopt the responses previously given to the particularly numbered Paragraphs of the Complaint.

**Affirmative Defenses**

5.     Based upon the facts set forth below, Defendants Set forth the Affirmative Defenses of laches, estoppel, waiver, fraud in the inducement, fraud in the factum, unclean hands, prior breach, the economic loss rule, and the counterclaims set forth below.

**Facts**

6.     Counter-Defendant Yumilicious is a franchisor of yogurt stores. Except for those acquired by Counter-Plaintiffs, they are all located in Texas in and around the DFW Metroplex area. The principal spokesman for Counter-Defendant is its CEO, Founder, and member, Salina Pham. The statements made herein were by her to Counter-Plaintiff Barrie, in person, at various meetings in the offices of Yumilicious in Dallas prior to the signing of the Franchise Agreement(s) for the purpose of inducing Counter-Plaintiffs to open stores in South Carolina by convincing them that Yumilicious could go national and supply products to stores outside Texas. Some of the statements were in writing and personally delivered to Barrie and the Counter-Plaintiffs or sent by e-mail.

10.    Counter-Plaintiff Why Not has acquired two franchises from Counter-Defendant located in Lexington and Forest Acres, South Carolina. Why Not signed the Forest Acres agreement but there is some doubt as to the signing of the Lexington agreement. Consequently, they will be referred to herein as the "franchise agreement(s)". The individual Counter-Plaintiffs have signed guarantees pursuant to those franchise agreement(s).

11.    A dispute has developed between Counter-Defendant and Counter-Plaintiffs regarding the franchise agreement(s) and guarantees as described below.

12.    Counter-Defendant committed the following acts of wrongdoing:

**Misrepresentation and Fraudulent Inducement**

    **National Distributor**

13.    Counter-Plaintiffs were assured that, although Counter-Defendant's affiliate and franchise stores were only local in the DFW area, Counter-Defendant was preparing for national franchising and would be able to provide essential and required proprietary products through Counter-Defendant's' approved distributor, and that Counter-Plaintiffs would benefit from Counter-Defendant's ability to leverage group purchasing.

14.    To launch the Forest Acres store, Yumilicious delivered a 4 month inventory of essential proprietary product prior to opening, so the gravity of the distribution and supply issues was not immediately evident.

15.    Because initial sales were good and local reception very positive to the products and Counter-Defendant's repeated assurance that the agreement with the regional distributor, Southwest Traders, was ending and Counter-Defendant was in process of negotiating a contract with a national distributor that would ensure a reliable and cost effective supply of the required Yumilicious yogurt base and flavors, Counter-Plaintiffs were subsequently induced to enter into a second franchise agreement for another location in Lexington.

16.    This was done in reliance on Counter-Defendant' express representation that Yumilicious was at last switching from a regional to a national distributor who would be able to provide essential product at a fair market price including shipping costs.

17.    Instead however, Yumilicious entered into an exclusive agreement with another regional distributor, Domenico, who would not deliver to South Carolina and in fact only services the Dallas area stores.

18. In order to obtain essential product to operate the stores and comply with the terms of the franchise agreements, Counter-Plaintiffs, the Glynns, ultimately used their relationship with national distributors (Sysco and Merchants) derived from another food service business to obtain essential proprietary product. Even then, the cost of proprietary product was 20-40% higher for Why Not than for the Texas stores, making failure a virtual certainty.

**Store Failures**

19. From inception, Why Not was forced to purchase Yumilicious product in quantities sufficient to ship by the pallet to satisfy the constraints imposed by Counter-Defendant's exclusive regional distributor and pricing requirements. No such requirements were imposed upon Counter-Defendants' Texas stores.

20. When Why Not, was unable to pay for pallet sized orders, rather than arrange to sell smaller quantities and solve the shipping problem, Yumilicious cut Counter-Plaintiffs off from essential required and proprietary product for six months from July to December 2012! Just as competitive yogurt shops were being developed locally in the Columbia, South Carolina market and offering a wide variety of flavors, the Yumilicious brand that was new to the area was crippled by its own franchisor and unable to compete. These were the busiest months of the year and sales never recovered from the setback.

21. In October 2012, with no assistance despite repeated calls for help, the Forest Acres store closed. And now that current suppliers are no longer willing to deal with Yumilicious, Why Not had no way to obtain product on a reliable basis –albeit at an exorbitant price because of the many layers of distribution.

22. As a result, **the closure of the Lexington store is imminent** and inevitable when it runs out of critical product.

**Violations of the Federal Trade Commission ("FTC") Franchise Rule and Business Opportunity Acts**

23.     Yumilicious has filed a notice claiming exemption from registration under the Texas Business Opportunity Act by claiming compliance with the FTC Franchise Rule.  As Counter-Plaintiffs have recently discovered, however, it appears that Yumilicious has never been in compliance and certainly was not with respect to the FDD they received.

24.     The pre-sale disclosure requirements that must be met by providing a complete and accurate Franchise Disclosure Document are imposed by the Federal Trade Commission's Franchise Rule (16 CFR §436.1 et. seq.) and required by the South Carolina franchise law.

25.     The Texas Business Opportunity Act requires compliance with the FTC Franchise Rule in order to maintain an exemption and avoid a *per se* violation of the Texas Deceptive Trade Practices Act (DTPA), which provides for recovery of all damages including consequential damages and punitive damages which may be trebled under the DTPA , as well as recovering attorney's fees.  Further, at the time of selling the initial franchise, Yumilicious was not in compliance with the South Carolina Business Opportunity Law.

26.     The consequences of failing to provide a FDD in compliance with the FTC Franchise Rule are violations of multiple statutes including the Texas and South Carolina Business Opportunity Acts, the Texas Deceptive Trade Practices Act and, as well as the FTC Franchise Rule itself.

**Misrepresentations, Omissions and Fraudulent Inducement within the FDD-  For Example**

27.     While Yumilicious provided Counter-Plaintiffs with an FDD that was materially deficient in numerous respects. The following is a non-exhaustive list of the most egregious examples.

a.      Counter-Plaintiffs signed their Forest Acres franchise agreement in May 2010, but the

issuance date of the FDD is June 8, 2008. There are numerous date and disclosure inconsistencies throughout indicated a failure to provide a timely and complete updated FDD.

    b.    Yumilicious did not provide an updated current FDD prior to the Lexington franchise agreement.

    c.    Contrary to the requirements of Item 8 of the FDD which mandates that all required purchases and required and sole approved vendors must be disclosed, no mention was made of an architect nor a single, exclusive distributor from whom all Yumilicious proprietary product must be purchased.

    d.    Start up costs: There were numerous difficulties in the buildout and fixturing of the first store as a result of mistakes made by the sole approved suppliers and approval processes Counter-Defendant required (e.g. architect) which resulted in buildout costs that were more than double the costs disclosed in Item 7 of the FDD and by Counter-Defendant' direct representation to Counter-Plaintiff, Barrie. The estimated range grossly underestimated predictable startup costs which was a crippling financial blow, subsequently compounded by the exorbitant cost of proprietary products required by Yumilicious.

    28.    Contrary to the requirements of Item 19 of the FDD, Counter-Plaintiffs were provided with earnings financial performance representations (FPRs) on several occasions, outside the four corners of the FDD, including on April 19, 2010, <u>six weeks before the date they ostensibly signed both franchise agreements</u>.

**The Franchise Agreement(s)**

    29.    Representative breaches of the Franchise Agreement(s) by Yumilicious Franchisor include:

    a.    Paragraph V.B. On Site Evaluation - none was provided for either store.

  b. Paragraph V.F. Inspections and On Site Evaluations - None were conducted.

  c. Paragraph V. H. Operational Advice - As examples: None was provided when critical assistance was requested for failing stores; wrong information was provided in operation of franchisor mandated equipment; no help was provided for inventory management and cash flow management in light of constraints imposed as a consequence of having a sole approved distributor for required product.

  d. Paragraph VII. Sourcing - The Franchisor has failed to provide approved suppliers capable of supplying Why Not with food and beverage items on a basis that allows the South Carolina stores to succeed. Instead both stores were doomed to fail, and inevitably for Counter-Plaintiffs to lose their investments and put personal assets and the business relationships of other unrelated businesses at risk.

**Summary:**

  30. There are numerous other misrepresentations and material omissions from the FDD, violations of various laws and breaches of the franchise agreement, but the facts and circumstances described above more than suffice to entitle Counter-Plaintiffs to return of all monies paid to Counter-Defendants to date, as well as reimbursement of all costs, expenses and consequential damages incurred in attempting to develop the Yumilicious franchised businesses and attorneys' fees to date of judgment.

**Texas Law**

  31. Counter-Defendant filed a notice of exemption with the Texas Secretary of State from registration under the BOA as a franchisor complying with the FTC Franchise Rule. Failure to comply is a violation of the DTPA which entitles the injured party to damages, injunctive and other equitable relief as well as potentially up to treble damages for such violations.

**Federal Trade Commission Franchise Rule Violations by Counter- Defendant**

32. Counter-Defendant did not comply with the FDD disclosure requirements and committed the above described FTD Franchise Rule Violations.

**Disclosure Violations**

33. All of the above constitutes violation of the Texas and South Carolina franchise disclosure laws, thereby causing Counter-Plaintiffs damages in an amount in excess of the minimum jurisdictional limits of this court.

**DTPA**

34. All of the above constitutes violation of the Texas DTPA thereby causing Counter-Plaintiffs damages in an amount in excess of the minimum jurisdictional limits of this court.

**Fraud, Fraud in the Factum, Fraud in the Inducement**

35. All of the above constitutes fraud, fraud in the factum, and fraud in the inducement by Counter-Defendant thereby causing Counter-Plaintiffs damages in an amount in excess of the minimum jurisdictional limits of this court.

36. These fraudulent misrepresentations were on going until the failure of the Forest Acres store and could not, through reasonable diligence, have been discovered by Counter-Plaintiffs until shortly before that time.

**Breach of the Franchise Agreement(s)**

37. All of the above constitutes breach of the franchise agreement(s) by Counter-Defendant hereby causing Counter-Plaintiffs damages in an amount in excess of the minimum jurisdictional limits of this court.

**Civil Conspiracy and Aiding and Abetting**

38. All of the above constitutes civil conspiracy to commit fraud and negligent

misrepresentations, omission, DTPA Violations and violations of the South Carolina by Counter-Defendant and Pham and/or aiding and abetting each other in doing so thereby causing Counter-Plaintiffs damages in excess of the minimum jurisdictional limits of this court.

**Negligent Misrepresentation**

39. All of the above constitutes negligent misrepresentations by Counter-Defendant thereby causing Counter-Plaintiffs damages in excess of the minimum jurisdictional limits of this court.

**Declaratory Judgment**

40. Counter-Plaintiffs further request a declaratory judgment as to the rights and obligations of the parties under the franchise agreement(s). Specifically, Counter-Plaintiffs request that the franchise agreement(s) be declared null and void and that the personal guarantees signed by the individual Counter-Plaintiffs be declared null and void.

**Damages, General and Consequential**

41. Counter-Plaintiffs have suffered and will continue to incur actual, consequential and incidental damages in reliance on the misrepresentations and concealments of Counter-Defendant described above. To date, these damages total in excess of $1,000,000.

**Attorney's Fees**

42. Counter-Plaintiffs further pray for attorney's fees in accordance with the TCPRC Sections 38.001 *et seq,* the DTPA and the terms of the franchise agreement(s).

**Punitive and Enhanced Damages**

43. Counter-Plaintiffs further pray for punitive, trebled and enhanced damages as set forth above.

**Statutory Remedies**

44.     Counter-Plaintiffs further pray for rescission, all relief afforded by the Texas franchise laws as set forth above.

**Jury Demand**

Counter-Plaintiffs demand trial by jury on all issues so triable.

**Prayer**

Counter-Plaintiffs pray that upon trial hereof, Counter-Plaintiffs be awarded damages, punitive damages, enhanced and statutory damages, rescission, termination of the Agreements with all monies returned to Counter-Plaintiffs, statutory remedies, declaratory relief costs and general relief and, further, that Counter-Defendant take nothing by its claims in this suit.

    Respectfully submitted,

    GARY E. SMITH, P.C.
    GRAHAM, BRIGHT & SMITH
    Attorneys and Counselors


    By:   /s/ Gary E. Smith
        Gary E. Smith
        State Bar Number: 18593700

    Two Lincoln Centre
    5420 LBJ Freeway, Suite 300
    Dallas, TX 75240
    972-788-5300 Telephone
    972-770-2156 Facsimile

    **ATTORNEYS FOR DEFENDANTS/COUNTER-PLAINTIFFS**

## CERTIFICATE OF SERVICE

The foregoing has been served upon all parties via electronic notification from the U.S. District Court only on this the 18th day of December, 2013.

   /s/ Gary E. Smith
Gary E. Smith